The next state's call for oral argument was Peoples v. Roye. I'm here to argue today about perhaps the worst run trial I've ever seen. This is a murder case where the defendant is the on-again, off-again boyfriend of a woman who lived with another man. As was his habit, he went to visit her every morning after the live-in boyfriend and the father of her child went to work. One morning he arrived and he found her dead. He panicked. He tried to revive her. He did everything he could. He got a little bit freaked out a little bit. He called his friend who said, have you called the police? And he said, oh, no, I haven't. Called the police. So he did. Within an hour of his arrival, he claimed that he arrived around 7.15. I believe that the first officer was on the scene at 7.55 a.m. That officer came into the house. The defendant was in the back room with his girlfriend. And he called, we're back here. The officer entered the room and he saw essentially a bloodbath. He said at the time that some of the blood looked as if it was coagulating already. Even after a partial investigation of this case and a long trial, we still don't know much more than we knew then. That we had a dead woman with a boyfriend, with a live-in, with a child, and perhaps with another boyfriend. And we don't know any more than that. We don't know when she died. That's kind of important. The boyfriend, Ron Burmester, testified that she had come home the night before. They had made love. They had fallen asleep. And he had left at 6.45 in the morning, as was his habit. And he drove to the Huck's, left her behind home. I think she was awake. He kissed her goodbye. He went off to Huck's and then he went to his work. The next he heard, hours later, was from the police that she was dead. The police officers spoke with the defendant there on the scene. They eventually took him to the police station. They took his clothing. They took, I believe, hair samples and a plethora of stuff. They also took from Ron Burmester his clothes that he changed into at work. Not the clothes that he wore to work. Not his street clothes. But his work clothes that he changed into while he was there. Interestingly, they found on Ron Burmester's sock a mixture of his blood and Casey Morgan's blood. On the defendant's clothes, they found blood all over. Shmears all over because he had tried to revive her. And he laid there with her in the pool of blood and tried to help her. They found, according to the blood spatter expert, they found a mixture of Casey's blood and the defendant's blood on his clothes. And also some blood spatters on both his left leg of his pants and the right leg of his pants. Everything else, even the blood spatter expert testified, was consistent with exactly what he had said had happened. That he had tried to revive her and lay with her. So what do we not have? We don't have any witnesses. We don't have a weapon, such as a knife that the pathologist said would have been a very common type of knife that was used. We don't have a confession. In fact, we have a three-hour video of the defendant saying he didn't do it. We don't, as I said, most importantly, have any idea when she died. Other than Burmester's testimony that she was alive when he left at 645 in the morning. The most simple test wasn't done. No temperature was taken of her. We don't know if she was 80 degrees when the police showed up in the morning and when the defendant found her. We have no idea. Maybe she died the night before. We have no idea because nobody bothered to do the research to find out something as simple as that. And think about that. That's pretty important. If she was dead at midnight the night before or 11 o'clock the night before, nobody would know it because we don't have any testimony of who else saw her other than Ron Burmester. We have no idea. And the defendant was somewhere else at that time. So he certainly didn't do it if she died then. And if the state can't prove that she didn't die the night before, then how could they possibly prove the defendant did it that morning? We don't have anything else. We have nothing else at all. In addition to the blood spatter evidence, the jury was allowed to see a lot of evidence that they never should have. And then ultimately, the judge agreed with. They were allowed to hear that there were three knives found in the defendant's truck. They were excluded. They didn't do this. There was no blood on them. Nothing happened. But talk about knives. In a scene, a grisly scene, where the damage was done by knives, that's pretty dangerous stuff. The jury never should have heard anything about that. Long after the evidence was presented, the defendant asked the judge to bar that testimony. And he agreed. That wasn't admissible. What have they got to do with anything? But nobody ever instructed the jury that what they heard about knives didn't matter and that they shouldn't consider it. Counsel didn't bother to ask anybody to instruct. And he dropped the ball there. There was also a cell phone message that was discussed, and a tape of it playing. It was the defendant calling a friend, Jeff Miller, and leaving a message. It wasn't quite frantic. The next phone call to Jeff's wife, Jessica, who was the defendant's best friend, was more frantic. The state used that as evidence that he was kind of faking up some emotion here to explain what was going on. That was another thing that the judge eventually agreed, when he was finally asked, should never have been admitted. Again, the defendant didn't ask for any limiting instruction of the jury to be told not to consider it. The cell phone itself, the actual cell phone that the defendant used, had no blood on it. And there was a chain of custody issue. So again, at the end of the trial, when the defendant asked that that not be admitted after it had already been talked about all day, the judge agreed. You're right. What's that got to do with anything? A mutilated photograph of Casey. I don't remember if it was Casey herself or Casey and the defendant together. It was torn up. It had holes in it. There was some discussion about why would those holes be there. Did the dog get hold of the picture? Was it a thumbtack hole? Some discussion about that. No one ever saw the photograph. I haven't seen the photograph. I don't know where it is. It's not on the record. After all that was talked about, the defense counsel finally asked the judge to bar that, and he agreed. That shouldn't be presented either. But again, the jury's already heard all about it. No one asked for any sort of limiting instructions, so the jury didn't know to consider it. But the most important thing the counsel screwed up in this case is not asking for a prior hearing of a blood spatter evidence. This was a very complicated, very bloody scene. It was an absolute mess. The blood spatter technician is the only person who can claim or ever did claim the defendant was there when it happened, and he based that on these teeny tiny, under three millimeter spots of blood on his pants. Unfortunately, that kind of evidence has not been found to be, per se, admissible in Illinois, because nobody's ever asked for evidence. You know, the Fifth District has never issued a decision on it being commonly accepted so that we can have that kind of expert testimony. The larger problem I have with this is the actual officer, the so-called expert, who was allowed to testify about it. This is a man with a two-year degree in criminal justice. He has no science background. Blood spatter evidence is about physics. It's about scientific principles. It's about any number of things. You can't even get the experts to agree on what it's really about. But we know it's not just about criminal justice, and that's what his education was in. When asked what the properties of blood were, he said he didn't know, because they don't teach that in the blood spatter class. So he knows essentially nothing, according to what he testified to at this trial, to establish that he is qualified to tell anybody what blood means, what that piece of blood means versus what that piece of blood means. What was his occupation? I believe he was a police officer. I think so. He was a CSI with the State Police. But he admitted that he had absolutely no scientific background, no education at all, no degree in it. He wasn't a state trooper, then? I don't think so. He was a CSI guy. Yeah, crime scene investigator, so not a trooper. He has testified in cases like this before, but again, there's one case in which... You're saying that there's no qualifications for those positions? I say he wasn't qualified to have these positions. He was found qualified in a case out of the 4th District called Evans. But in that case, he gave much more information, and he didn't say anything absurd like, I don't know what blood is made out of, like he did in this case. That's a little strange. I think if a man's going to tell you how blood behaves, he should be able to tell you what it's made out of. And he couldn't do that. Yet despite all that, counsel didn't ask to have the proper foundation laid or a prior hearing held to prove that this evidence is the type that should be admissible because it's commonly accepted and that this is the old boy who ought to be telling you about it. He didn't do that. He just completely failed to do it. Without that teeny tiny, under 3 millimeter drop of blood on defendant's pants, which might have gotten there while he was trying to revive her with his fumbled attempts at CPR. We have no reason to believe he's there, but should I? We don't have any other evidence that says he was. Yet counsel dropped the ball on that too. I mean, all of these things, there's like 7 or 8 errors, blatant errors that counsel made. And in a case where we don't have anything else to prove who did this, other than her boyfriend saying, well, I didn't do it. She looked good when I left her. This is a boyfriend who has a history of beating her, by the way, and has been in trouble for that before. And who's finding out that she's still sleeping with somebody else and maybe a third party. I mean, this is a man who's got something to be mad about. We're taking his word for it that she was alive at 655 and we're not even taking her temperature to find out if that was true. Yet we're sending a man to prison for 60 years? Was there an explanation of why they didn't take the temperature to determine the time of death? None that I could find anywhere in the record. It just seems to me, honestly, that they were a little overwhelmed and just dropped the ball. I mean, that's what this whole case is about. People drop the ball at every angle. Virtually everyone involved in it. Did I hear you say that this is the same expert that testified in the Evans Fourth District case? Yes. At least he has the same name, if I can tell you that much. Also, in Evans, the testimony that he gave was nowhere near as complicated. And it wasn't about, that's something I didn't get to, it wasn't about as many detailed scientific points as this piece of blood means that. That's not what he said in Evans. It was more like this is what a piece of blood would look like if it dropped from here. As opposed to this piece means this, like he did in this case. So even if he was qualified there, that doesn't mean that he's qualified here to give these particular opinions like he did. Thank you, Counsel. Counsel? May I please report, Counsel? First, very quickly, with regard to Defendant Issue 2, which wasn't discussed today, the videotape issue. In addition to being forfeited for not being raised below, the defendant is not contesting any statements made prior to 1.04 p.m. And I mention this because in a defendant's reply brief, there's a new argument regarding a statement made at 12, a new argument, which is, which fails for three reasons. Number one, it wasn't made in the opening brief. This is an argument that the defendant's statement, I'm done, combined with a silence, constituted an invocation of Miranda rights. First, this wasn't made in the opening brief. Second, the statement, I'm done, occurred before 1.04 p.m., and so isn't even included in that portion of the tape that the defendant is contesting. And third, this statement, I'm done, was not made in conjunction with any silence. It occurred at 12.44, and in the people's brief at page 30, the defendant's subsequent soliloquy is transcribed for the court. This is not a case in which the defendant said, I'm done, and then remained silent. Then, in the alternative, the defendant asks this court to review the three-and-a-half-hour-long videotape itself and find some other error, some other unnamed, unpinpoint-sided invocation of defendant's Miranda rights. And I'd remind the court that it's not a depository into which the defendant may dump the burden of finding error, especially where, as here, the asserted error can only be reviewed for plain error. At any time, do you recall in that video whether the defendant said, I want an attorney, I'm done talking, things like that? The defendant states that this occurs, but doesn't state the precise words that the defendant used in the videotape. With regards to Defendant's Issue 1, the sufficiency of the evidence, number one, the defendant states that Casey's blood was found on Burmester's sock. The people refute this baseless factual assertion in their brief. In fact, this was not the testimony of the expert witness. Second, the defendant states that Burmester had a history of violence against Morgan. There was a previous arrest of both parties for a domestic that the arresting officer characterized at trial as, quote, verbal. As what? Beg your pardon? As what, as verbal? Verbal, yes. Okay. In addition, the defendant's father, while he did testify, or excuse me, the victim's father, while he did state his sentencing, that there may have been some violence there, also stated that he believed that the defendant was stalking the victim and that she was afraid of the defendant as well. I'd remind the Court that a hypothesis that another person committed a crime without warrant does not create reasonable doubt, that there's no positive evidence that Burmester committed this crime. And I'd note that in the Defendant's Supply Brief, pages 1 and 2, several assertive factual statements are made that are not accompanied by a record of citations, and which do not have any support in the record. First, that Burmester knew that the victim was cheating on him. There's no basis for this in the record. Second, that the victim came home the night before she was murdered, later than Burmester expected her to come home. There's no basis for this in the record. Third, that the victim lived with Burmester during her relationship with the defendant. I don't see a basis for this in the record. I remember looking to see whether the record supported any inference about where she lived during the summer of 2007, when she had her three-month relationship with the defendant, and I couldn't find one. And then fourth, that the victim was seeing the defendant throughout the course of her relationship with Burmester. This can't be true, because the victim had a baby with Burmester, but her relationship with the defendant lasted three months. So, again, I'd point out that there aren't any record citations for any of these assertions that appear for the first time in the reply brief. The defense says that we don't have the time of death, which you agree with. That is true, yes. Is there inconsistency in the testimony about when the defendant got to the residence, whether Morgan was alive or dead? Is there inconsistency as to whether she was alive? The defendant, I believe, stated at one point that he was trying to revive the victim and stop the bleeding. I believe there was other testimony that she wasn't bleeding anymore, that he believed her to be dead when he found her, when he walked in. So the defendant's statement was there was some inconsistency as to whether he believed her to be salable or whether he believed her to be dead when he found her. As far as when the defendant arrived at the house. Was there testimony from him that she was breathing or she was spitting blood or anything to indicate she was still alive? Nothing of that nature, Your Honor, no. As far as when he arrived at the house, though, there is no dispute. He told the police twice that he arrived at 7-18 and he told the millers, I believe, that he arrived at 7-15. So there's no dispute as to when he arrived. He arrived approximately 35 minutes before he called 911. With respect to the Fry argument, I'd note the following. First, that there wasn't just one drop found of blood, that there were multiple drops found. And this is a factual assertion that, again, the people refute in their brief. Second, that expert witness Carter specifically stated that the spatter could not have come from any attempt to render aid. This was not a spatter consistent with that. Again, that's a factual assertion made today that's refuted in the people's brief. Third, in response to your question, Your Honor, Carter was a master sergeant with the Illinois State Police who had 10 years of experience in blood spatter analysis. Fourth, the case Evans out of the 4th District in 2006 says that blood spatter analysis is, quote, generally accepted in the state of Illinois. And, in fact, no case, reported case, has ever held that blood spatter analysis is unacceptable under Fry. The various Illinois cases that come down on one side or the other of this issue do so on the basis of whether a sufficient foundation was laid. For example, in the Owens case, in which such a foundation was not laid, the purported expert didn't give any testimony about his education and training. In contrast to David Carter's, I believe, 258 hours of training that he had when he gave the testimony here. Was the 4th District case as a result of a Fry hearing or a comment by the court? Well, there can't have been a Fry hearing because the 4th District stated that a Fry hearing is only necessary where the field of inquiry here, blood spatter analysis, is new or novel. And I know that the 4th District stated that a Fry hearing was not necessary. As to whether one was conducted at the trial level, it's escaping me. And I'd also note, with respect to the questioning of Carter's qualifications here today, that the defendant on appeal is not contesting the trial court's decision to certify Carter as an expert, which decision would be reviewable on an abuse of discretion basis at any rate. Finally, with respect to the defendant's argument for the various assertions of ineffective assistance of counsel, I'd note that there's a distinction between the testimony offered, to which the defendant did not object, and the physical objects upon which that testimony was based, which were not admitted into evidence. And the defendant hasn't cited a case for the proposition that testimony must, when it refers to physical objects, must refer only to physical objects that have already been admitted into evidence. And as for the rest of argument four, I'll stand on my brief. Does this court have any questions? I don't believe so. Thank you, counsel. Thank you. Counsel? I have several points to make in rebuttal. First being that there's an awful lot of effort spent on what I may or may not have misstated, but I can submit altercations to you to show you record sites and everything they doubt that is in the record, because I guarantee you it's in the record or it wouldn't have made it in the brief. I wasn't there. I couldn't have made this stuff up. That wouldn't do me any good. So I can absolutely, if you would like me to do that, and are willing to give me the record back, I can have that to you in a matter of days, record sites to back up every single one of the positions that I've stated today. I can also tell you that the police officer who came to the house, I think one of the earliest officers, said that he had been there. He recognized the house because he had been there for a domestic call before. There wasn't a one-time verbal dispute. Other co-workers of Burmester said he knew that there was a volatile relationship, that there was a potential drug problem that Casey didn't like, and there was a lot going on in that relationship. I also believe that I never said that she was involved with the defendant the entire time she was with Burmester, because I know that's not true, and I don't believe that was ever said in the record. As far as the videotape says, I did run out of time before I got to talk about that, and I would like to. I think it's very clear that when he says, I'm done, which I believe he says about halfway through the first video, that that means I'm done. You're asking me questions, I'm done. I'm done talking to you. As he said, I want a lawyer. He said that 20 minutes toward the end. From the end, he finally said, I want a lawyer then. But those are two different things. Asking for a lawyer and asserting his right to remain silent are two totally different things. He has both of those. He asserted both of them. Interestingly, when he said he wanted a lawyer, some unidentified voice in the background said something to the effect of, you haven't said anything that would make you need a lawyer, or what makes you think you need a lawyer. But then the questioning stopped. It did stop. However, the jury was still shown that portion of the video. So they saw him repeatedly saying, I'm done talking to you, I'm done talking to you, I want a lawyer. They're not even supposed to say that much. It should have been cut off right before those words were said. So you think that's a dual violation? Absolutely. If he wanted to redact every statement that he said in there that the jury shouldn't have seen, the video would have been two hours instead of three and a half hours long. And that's really what should have been done if they were so insistent on showing it. And the defense counsel did object to the video being shown. Absolutely. He didn't think it should be in there at all. But he argued that it was a violation, that he was in custody and hadn't been given Miranda. I don't really know what went on there. And the video itself doesn't support things clearly enough for me to have argued one way or the other, because it stops and starts. And there's reference to Miranda having been given, yet that's not on the video. So that's not the argument at all. It's that he asserted his rights repeatedly. And the statement had been allowed to tell the jury that, but they're allowed to show them a video of him asserting his rights? How does that make him look? Not very good. I mean, we're not the same as jurors who don't understand things the way that we understand them. They don't understand that that means anything but what's he need a lawyer for? Why won't he talk to them? You know how jurors understand that. That's why it's such a hardcore rule that they're not allowed to be told that a defendant has asserted their rights, certainly not shown a video of it. But they were. And after that happened, the prosecutor got to arguing a closing argument about what did that mean. And he tried to avoid telling us anything because he didn't want to tell us the truth. It was evasive. If you couldn't show him the video, then you couldn't make that comment. But yet again, counsel dropped the ball, and he didn't do that either. He didn't object properly on the proper grounds to have that kept out. And that was an error. What else? Also, we're doing more here than suggesting that someone else might have done it, and it's not our job to prove that Ron Burmester didn't do it or that he did it. I don't have to prove that. The defendant doesn't have to prove anything. But what he is here to show you is that nobody proved him guilty either, in life, with or without what we know about Ron Burmester. The state didn't do its job. The police didn't do their job. The medical examiner didn't do their job. Nobody did their job in this case. All they had was a dead woman and a man laying with her, holding her. And the next thing you know, my guy's in prison for 60 years. And there aren't any things to connect day one to today. There's just not enough to justify that. And he has to do a diverse conviction. Or, at the very least, give him a new trial based on how effective the counsel was. Thank you. Thank you, counsel. We appreciate the arguments of counsel.